# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# OCALA DIVISION

JUNIOR ORLANDO ANDREW,

    Plaintiff,

v.

    Case No. 5:23-cv-102-TJC-PRL

WASTE PRO OF FLORIDA, INC.,
and WASTE PRO USA INC,

    Defendants.

## **O R D E R**

**THIS CASE** is before the Court on Defendants' Motion for Summary Judgment on All Claims Asserted by Plaintiff Junior Orlando Andrew. Doc. 33. Andrew has sued his former employer, Waste Pro of Florida, Inc. Doc. 26. The claims include failure to pay overtime (in violation of the Fair Labor Standards Act), race discrimination (under Title VII), retaliation (under the FLSA and Title VII); and a hostile work environment (under Title VII).[1] Andrew has opposed summary judgment.[2] Doc. 37.

---

[1] Waste Pro has addressed claims it considered raised by Andrew's testimony or filings, even if unclear or not identified by separate count, and the Court will do the same. Doc. 33 at 1 n.1.

[2] Andrew's pro se opposition offers limited admissible evidence and suggests evidence should be subpoenaed by the Court, but this is not the Court's role. Compare Doc. 37 at 2, with Doc. 2 (identifying pro se resources including "The Court's Guide for Proceeding Without a Lawyer" which states "You are responsible for doing everything necessary for the action to move forward,"

## I. FACTS

Waste Pro[3] provides solid waste collection and disposal services in Florida. Doc. 33-1 ¶2. Waste Pro hired Andrew as a driver in October 2018. See Doc. 32-1 at 14. Andrew was initially paid a day rate of $140, a fixed amount for all hours worked that day. See Doc. 33-1 ¶¶5, 9. Andrew received multiple raises, including a promotion and raise in March 2021 to $180 per day, from recycle driver to curotto driver.[4] See Doc. 33-1 at 9, 23, 42, 61, 73, and 238. On August 15, 2021, Andrew, along with all other drivers paid a day rate, was switched to an hourly rate. Docs. 32-1 at 26; 33-1 at 84. Andrew's initial hourly rate was $19.75, and it increased to $20.15 on December 25, 2022. Doc. 33-1 at 84, 122.

---

including needing to gather evidence and prepare discovery requests.)

[3] References to Waste Pro are to Waste Pro of Florida, Inc., because it is undisputed Andrew was employed by Waste Pro of Florida, Inc., and was not employed by its parent, Waste Pro USA, Inc. Doc. 33-1 ¶4.

[4] Andrew testified driving the curotto truck (which has an automated arm to lift the garbage or dumpster) is more desirable because it is less physically demanding and pays more. Doc. 32-1 at 19–20. Even so, Andrew argued this was not a promotion because he was not given a choice about the change. See Doc. 32-1 at 39. Andrew had other work assignment changes, which are either not relevant or not part of a viable claim. For instance, Andrew mentions he was not given a promotion, but it is not part of his EEOC charge and therefore cannot proceed because of failure to exhaust administrative remedies. Compare Doc. 1 at 4, with Doc. 1 at 20–22; see Gregory v. Ga. Dep't of Hum. Res., 355 F.3d 1277, 1278–80 (11th Cir. 2004); Batson v. Salvation Army, 897 F.3d 1320, 1327 (11th Cir. 2018). Similarly, any claim about being replaced as a front-end driver in 2019 is out of time. Id.

On March 11, 2019, Andrew joined another lawsuit alleging Waste Pro (the Florida entity and other related Waste Pro entities) failed to properly pay or calculate overtime, but Waste Pro was ultimately dismissed from the case.[5] See Doc. 26 at 6. Andrew testified he repeatedly complained about working long hours and his pay.[6] See e.g., Doc. 32-1 at 25, 31, 35, 42, 52, and 63. Whether paid daily or hourly, Andrew was paid overtime whenever he worked more than forty hours in a single work week, although overtime was calculated differently based on being paid daily or hourly.[7] See Docs. 33 at 24; 33-1 at 84–122; 37 passim.

---

[5] The case was Hansen v. Waste Pro USA, Inc., 2:17-cv-2654, United States District Court, District of South Carolina, Charleston Division. Waste Pro of Florida, Inc., was dismissed for lack of personal jurisdiction and plaintiffs who joined based on an employment relationship with Waste Pro of Florida, Inc., such as Andrew, were also dismissed. Doc. 170 (Hansen, July 25, 2019).

[6] It appears Andrew was complaining that his hourly rate decreased, which could have happened even though the day rate went up, if his hours also increased. See Doc. 32-1 at 25, 43.

[7] While paid an hourly rate, Andrew was paid overtime at time and a half. Doc. 33-1 at 84–122. While paid a daily rate, overtime was an additional half time premium, calculated in accordance with 29 C.F.R. §778.109. Andrew claimed he was paid less (or differently) due to his race, and there was evidence at least two coworkers, Carlos Rivera and Doug Jollimore, were paid higher hourly rates. See Doc. 33-1 ¶24, at 244. Andrew failed, however, to provide any evidence rebutting Waste Pro's argument that pay differences were due to differences in experience. See id. ¶26. In addition, Andrew relied on hearsay evidence that Carlos Rivera, who replaced Andrew in 2019, was paid $25 an hour; while Waste Pro provided undisputed evidence Rivera was paid $18.75 hourly in December 2019. Compare Doc. 32-1 at 103, with Doc. 33-1 at 250–51.

3

Some of Andrew's other complaints during his employment included: (1) not being paid a safety bonus due to an accident;[8] (2) issues with his work truck,[9] (3) issues with his personal vehicle and Waste Pro's failure to investigate,[10] and (4) not being sent home during a hurricane.[11]

---

[8] The Parties dispute whether Andrew's accident disqualified him from the safety bonus, but this fact dispute is not material. Failure to pay the safety bonus is not part of the FLSA overtime claim. Andrew admitted to the accident but disputes the damage. Doc. 32-1 at 85–87. If considered as evidence of discrimination or retaliation claims, the accident would be a legitimate reason for disqualification that Andrew has not rebutted. There is no record evidence of others with similar accidents who received the safety bonus even though Andrew alleges similarly situated Caucasian coworkers were treated differently. See Doc.37 at 2, 10.

[9] Andrew alleged Waste Pro was trying to kill him by sabotaging his work truck because of problems with his truck after he complained. Doc. 32-1 at 62–63, 69. Problems include the backup camera not working multiple times, multiple gas leaks, issues with the hydraulic line, a route sheet being placed on the muffler (creating a fire risk), and a sponge on the motor. Doc. 32-1 at 47-49, 70–71, 81–82, 84. Issues with the backup camera started in 2019, and there were issues with hydraulic lines for over four years, including in late 2022 and January 2023. Doc. 32-1 at 51–61, 75–76, 79. Andrew never witnessed any sabotage, and understood some problems could be normal wear and tear. See Doc. 32-1 at 70, 81. Andrew did a vehicle inspection each morning before driving. See Docs. 32-1 at 56–57, 72–73; 33-1 ¶¶17-19. Problems he reported were generally fixed or Andrew did not have to drive the truck. Doc. 32-1 at 5, 75–76, 78. The only inspection report in the record is from October 13, 2022, about a gas leak that was fixed. Doc. 33-1 at 240–41.

[10] These include having male genitalia drawn in dust on the vehicle hood, tobacco juice/spit on hood, and having tires and valve stem cut, while parked at Waste Pro. Doc. 32-1 at 85, 88–92; Doc. 37 at 8. Andrew complained Waste Pro could have checked video footage to investigate but did not. Doc. 32-1 at 92.

[11] Andrew testified he had to work during a hurricane in November 2022, while coworkers were sent home. Doc. 32-1 at 93–95 (presumably Nicole, which made landfall as a Category 1 storm in Daytona Beach on November 10, 2022).

4

Waste Pro terminated Andrew on January 6, 2023. Doc. 33 ¶22. Andrew alleged his termination occurred after he reported another gas leak and Human Resources got involved. Doc. 32-1 at 79. Andrew testified HR sent him home, saying there would be an investigation. Id. When Andrew reported to work the next day, as requested, he was terminated for misconduct. Id. Andrew was told the misconduct was calling a coworker "Uncle Tom," which Andrew denies, but he admitted having a verbal altercation with a coworker.[12] Id. at 66–67, 79.

Waste Pro alleged it terminated Andrew because he made multiple disruptive accusations about the workplace, including that management was trying to kill him, management was part of the Mafia, and management caused a coworker to be decapitated. Doc. 33-1 ¶22. Andrew admitted he told coworkers he thought other employees were trying to kill him by sabotaging his truck; he accused management of being in the Mafia and KKK,[13] and thought Waste Pro had deliberately killed an employee. Doc. 32-1 at 48, 65-67, 78, 83, 101, 104–05.

---

[12] Andrew argued Waste Pro did not provide record evidence he caused a disturbance, but the Declaration of its Regional Vice President, Erik Sankey, provides admissible evidence of the termination reason. Doc. 33-1 ¶22. Andrew argued he did not admit to misconduct, but this fails to address his deposition testimony describing similar incidents and, in his opposition, Andrew appears to claim his actions are justified as self-defense because he was responding to someone cussing at him. Doc. 37 at 2.

[13] Andrew testified his coworkers were "good old boys," that Caucasians ran the show and were treated more favorably, like getting assigned to the curotto truck (which Andrew also drove). Doc. 32-1 at 74, 102.

Andrew also had complaints related to things outside of work or after his employment with Waste Pro ended, including: (1) Andrew believed Waste Pro interfered with his daughter's grades, (2) Andrew believed Waste Pro provided poor references to prospective employers, but he did not have proof, and (3) Andrew believed Waste Pro was responsible for graffiti (racial slur) where he walks his dog. Doc. 32-1 at 9–13, 96–100, 119.

Andrew filed a charge with the Equal Employment Opportunity Commission around May 10, 2022, alleging race discrimination and retaliation. Doc. 1 at 20–22. The EEOC issued a right to sue on January 11, 2023, and this lawsuit was timely filed on February 13, 2023. Doc. 1.

## II. ANALYSIS

### A. Standard

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Further, the Court will construe evidence in the light most favorable to Andrew.[14] See Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1098 (11th

---

[14] This does not include, however, accepting facts or arguments that are not supported with evidence. The Court has not detailed all such instances, but examples include assertions by Andrew that pay records and other evidence have been falsified and claims of white coworkers being paid more or receiving the safety bonus despite accidents. See Doc. 37.

Cir. 2014).

B. Alleged Unpaid Overtime (FLSA)

Although Andrew claims he was "never" paid overtime while he was paid a daily rate, his pay records show overtime was consistently paid.[15] Compare Doc. 26 ¶¶3-6, 10-11; with Doc. 33-1 at 44–83. Andrew's pay stubs show he was paid overtime when he worked more than forty hours in a week, and the overtime hours on his pay stubs match the overtime hours in the time records. Doc. 33-1 at 44–83, 158–197. Andrew's claim he was not paid overtime claim fails because the undisputed evidence show he was paid overtime.[16]

Andrew alleged records were falsified, and that he worked more hours than were reported (resulting in improper overtime payments). Doc. 32-1 at 117.

---

[15] Andrew admitted he was paid overtime once he was switched from a daily to hourly rate. Doc. 26 ¶15, Doc. 37. Andrew's amended complaint includes pay records from sixteen different pay dates between 2019 and 2023, all showing both overtime hours and overtime payments. See Doc. 26 at 7–24. Even if Andrew alleged a willful violation, anything before February 13, 2020, would be outside the statute of limitations.

[16] Another interpretation of Andrew's complaints is that his effective hourly rate decreased. See Doc. 1 at 20. While paid a daily rate, the overtime pay was calculated in accordance with the fluctuating work week method (thus the hourly rate might decrease even if the daily rate increased if hours also increased). The overtime calculation method or a lower hourly rate do not, by themselves, violate the FLSA. In order to establish a FLSA violation, Andrew must show the hourly rate decreased below minimum wage or the overtime calculation was wrong. See 29 C.F.R. §778.109 and 778.112. Andrew has not argued overtime calculations were wrong or that he was paid below minimum wage.

Andrew, however, does not dispute any specific time or pay records and does not provide admissible evidence to dispute them. Rather, he just makes the bare assertion records were falsified. See Doc. 32-1 at 43. In contrast, the time records show start and stop times for each workday and indicate approval by Andrew. See Docs. 33-1 at 124–234, 32-1 at 16–17. Based on this record, there is not plausible evidence to conclude the records were falsified, and summary judgment is properly granted as to the FLSA claim.

C. Race Discrimination (Title VII)

Andrew does not allege direct evidence of race discrimination, so the claim is analyzed under the McDonnell Douglas burden shifting framework. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under McDonnell Douglas, "[i]f the plaintiff makes out a prima facie case, the burden then shifts to the defendant to articulate a legitimate reason for the adverse action. If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297 (11th Cir. 2006) (internal citation omitted).

To establish a prima facie case of race discrimination, Andrew must show: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class." Maynard v. Bd. of Regents, 342

8

F.3d 1281, 1289 (11th Cir. 2003) (citing McDonnell Douglas, 411 U.S. at 802). To satisfy the fourth element, the alleged comparator must be "similarly situated in all material respects." Lewis v. City of Union City, 918 F.3d 1213, 1224 (11th Cir. 2019). A similarly situated comparator will ordinarily have (1) engaged in the same behavior; (2) been subject to the same employment policy, guideline, or rule; (3) had the same supervisor; and (4) shared a similar employment or disciplinary history. Id. at 1227–28.

To establish pretext, the plaintiff must show "the proffered reason was not the true reason for the employment decision . . . either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Jackson v. Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)). The evidence for pretext must show the employer's proffered reasons are not worthy of credence by a reasonable fact finder. Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 771 (11th Cir. 2005) (cleaned up). Even so, a court will "not sit as a super-personnel department that reexamines an entity's business decisions." See Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (quoted authority omitted).

Andrew is a member of protected class, qualified for his position, and his termination was an adverse employment action, but he has not presented

9

evidence of a similarly situated comparator. Even if Andrew established a prima facie case, Waste Pro provided evidence the termination was due to several incidents of disruptive behavior. While Andrew disputed this reason, he admitted to behavior like what Waste Pro described as the termination reason, including unsupported or far-fetched accusations, such as believing Waste Pro management belonged to the KKK and/or the Mafia, Waste Pro had an employee killed, and Waste Pro was trying to kill Andrew. Andrew has not rebutted the legitimate reason for his termination.

To the extent other incidents might be considered an adverse employment action, Andrew either lacks a prima facie case, does not rebut the legitimate reason offered, or fails to present a convincing mosaic of discrimination based on race. See Muldrow v. City of St. Louis, 601 U.S. 346, 350-351 (2024) (noting a "disadvantageous" change in terms and conditions of employment is sufficient for a Title VII discrimination claim). Andrew alleges other employees were treated more favorably, but he either lacks evidence to support the allegation or lacks evidence to establish any difference in treatment was due to race. Andrew thinks Caucasians received better work assignments and cites driving the curotto truck as example, but Andrew also drove the curotto truck. Doc. 32-1 at 102. Andrew complained about having to work during hurricane Nicole in November 2022, but testified while some coworkers were sent home, others had to work. Doc. 32-1 at 93–95. Andrew claims a coworker, Jollimore, was getting

credit for work Andrew did, but does not offer evidence or examples. Doc. 32-1 at 107–08. Andrew complained some employees were paid hourly while he was paid daily, but does not provide a connection to race, because he admitted some white drivers were paid day rates before the consistent change to hourly rates in August 2019. Docs. 32-1 at 109–10; 37 at 12. Andrew alleged a coworker, Carlos Rivera, was paid more but failed to offer evidence to show he and Rivera were similarly situated.[17] Doc. 32-1 at 103. Andrew complained it was race discrimination when Waste Pro did not review video footage of the employee parking lot to determine who drew male genitals in dust on his personal vehicle, but there is no evidence to support Waste Pro acted differently because of race. Doc. 32-1 at 92. Andrew complained in late 2021 he tried to call in sick and was told he needed a doctor's note, while other employees were not required to have doctor's notes, but Andrew did not offer specific details as to who was treated differently (or their race) or any information about the circumstances. See Doc. 37 at 4.

Other examples offered are without sufficient evidence, far-fetched, and/or happened outside of work, such as the allegation that Waste Pro was responsible for having his daughter's grades changed; that some supervisors used an app to disguise their voices and track his phone; or, after he was

---

[17] See supra, n.7.

terminated from Waste Pro, that Waste Pro was responsible for racial slurs where Andrew walks his dog. Doc. 32-1 at 115–19. Other examples are personal observations (or an explanation of motivations), but are not adverse employment actions, such as Andrew believing someone was part of the Mafia or belonged to the KKK.

The most serious allegation is that Waste Pro was trying to kill Andrew by sabotaging his work truck, but Andrew failed to present evidence to show the vehicle problems were more than typical maintenance needs or racially motivated, much less that the problems were "sabotage" intended to kill him.[18] In general, Andrew either had an opportunity to report issues with his work vehicle and/or they were fixed or addressed. Moreover, Andrew testified he thought the alleged sabotage to his work truck was in retaliation for his complaints, not because of his race. See Doc. 32-1 at 62–63, 69.

Based on this record, there is not plausible evidence to conclude Waste Pro discriminated against Andrew due to his race, and Waste Pro is entitled to summary judgment.

---

[18] Andrew never witnessed any sabotage to his work truck. Doc. 32-1 at 81. Issues with the backup camera were sometimes fixed (including by Andrew) after he reported them, or he drove the truck without a working back up camera and did not have any accident. Doc. 32-1 at 55, 58. Waste Pro fixed the gas leak, but it happened again. Doc. 32-1 at 78–79. Andrew noted issues on the Driver Vehicle Inspection Report, but issues fixed during his route were not reported on a DVIR. Doc. 32-1 at 73.

D. Retaliation (Title VII and FLSA)

To establish a retaliation claim, an employee bears the burden of showing (1) he engaged in protected activity, (2) he suffered an adverse action, and (3) a causal connection existed between the protected activity and the adverse employment action. Smith v. Haynes & Haynes P.C., 940 F.3d, 635, 648 (11th Cir. 2019) (for FLSA); Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001) (for Title VII).

Andrew can establish the first and second elements.[19] The termination is an adverse employment action and Andrew engaged in protected activity as early as 2019, either by participating in the other lawsuit, based on his pay complaints, or based on filing his EEOC charge. Even so, summary judgment is proper because Andrew has not shown a causal connection between any protected activity and his termination. When an adverse employment action occurs shortly after protected activity, the closeness in time may support a causal connection. Grant v. Miami-Dade Cnty. Water & Sewer Dep't, 636 F. App'x 462, 468-69 (11th Cir. 2015) (citing Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004)).[20] But when an adverse action occurs long after protected

---

[19] Waste Pro characterizes the complaints as work grievances, that did not amount to protected activity for the FLSA claim. See Doc. 33 at 10–11.

[20] The Court does not rely on unpublished opinions as binding precedent, however, they may be cited when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060-61 (11th Cir.

activity, more is needed to support a causal connection. Id.

For the FLSA retaliation claim, Andrew joined the other lawsuit almost four years before the termination and started complaining about long hours in 2019. Andrew has not provided any evidence to show his termination, four years later, is causally connected to the alleged protected activity.[21] For Title VII, Andrew's termination is more than seven months after he filed EEOC charge. There is too much time between the charge and his termination to support a causal connection without other evidence and Andrew has not provided other evidence of a causal connection. See Raspanti v. Four Amigos Travel, Inc., 266 Fed. Appx. 820, 823 (11th Cir. 2008) (citing Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007)) (noting a time gap of three to four months is not sufficient to provide a causal connection).

To the extent other issues could be considered an adverse employment action, the Court reaches the same conclusion: there is no evidence of a causal connection between the alleged protected activity and an alleged adverse employment action. For example, failure to pay Andrew the safety bonus, if owed, could be an adverse employment action, but Waste Pro provided evidence Andrew had an accident that disqualified him from the bonus. Andrew admitted

---

2022).

[21] After Andrew started complaining, he received multiple raises and at least one promotion.

14

to the accident, and merely disagreed it impacted his eligibility for the bonus. Andrew has not provided evidence about the eligibility requirements or sufficient evidence to establish the bonus was owed.

Based on this record, there is not plausible evidence to allow a reasonable fact finder to conclude that Waste Pro retaliated against Andrew.

E. Hostile Work Environment (Title VII)

To establish a race-based claim for a hostile work environment, Andrew must prove (1) he belongs to a protected class, (2) he was subjected to unwelcome harassment based on race, and (3) the harassment was severe or pervasive enough to alter the terms and conditions of his employment. Adams v. Austal, U.S.A., L.L.C., 754 F.3d 1240, 1248-49 (11th Cir. 2014). Only conduct based on a protected category, such as race, may be considered in a hostile work environment analysis. Jones v. UPS Ground Freight, 683 F.3d 1283, 1297 (11th Cir. 2012). Behavior that is merely unfair or rude, but not tied to a protected characteristic, does not support a hostile work environment. Hunsaker v. Found. Partners Grp., No. 6:18-cv-1996-Orl-22DCI, 2020 WL 10355118, at *11 (11th Cir. 2020) (citing Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs, 47 F.3d 1068, 1074 (11th Cir. 1995)).

15

Only a few incidents occurred during Andrew's employment that were related to race.[22] Andrew described some coworkers as "good old boys," and believes some belonged to the KKK, but does not offer any evidence of KKK membership. See Doc. 32-1 at 74, 101. In short, Andrew has not provided sufficient evidence to allow a fact finder to conclude he suffered a hostile work environment due to his race.

Accordingly, it is hereby

**ORDERED:**

1. Defendants' Defendants' Motion for Summary Judgment on All Claims Asserted by Plaintiff Junior Orlando Andrew, Doc. 33, is **GRANTED**.

2. The Clerk is directed to enter judgment in favor of Waste Pro of Florida, Inc. and Waste Pro USA, Inc. and against Junior Orlando Andrew and close the file.

---

[22] As discussed supra, Andrew testified many of the problems, especially with his work truck, were retaliation for his complaints and not because of his race. See Docs. 26 ¶¶9, 12; 32-1 at 62–63, 68–69.

**DONE AND ORDERED** in Jacksonville, Florida the 29th day of January, 2025.



TIMOTHY J. CORRIGAN
Senior United States District Judge

ddw
Copies:

Counsel of record

Junior Orlando Andrew
79 Dogwood Loop
Ocala, FL 34472

17